# SEALED

FILED

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

2011 JUN 15 PM 2: 37

CLERK. U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY CLERK



| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CRIMINAL NO. |
| Plaintiff, | § | |
| | § | **SA11CR0516** XR |
| | § | **INDICTMENT** |
| v. | § | |
| | § | [Violations: 50 U.S.C. § 1705 and |
| SUSAN YIP, (1), | § | 31 C.F.R. § 560, Conspiracy to Violate |
| a/k/a SUSAN YEH, | § | the International Emergency Economic |
| | § | Powers Act and the Iranian Transaction |
| | § | Regulations - Count 1; |
| MEHRDAD FOOMANIE, (2), | § | 18 U.S.C. §§ 371 and 1343, Conspiracy to |
| a/k/a FRANK FOOMANIE, | § | Commit Wire Fraud - Count 2; |
| | § | 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A), |
| AND, | § | Conspiracy to Commit Money |
| | § | Laundering - Counts 3 & 5; |
| MEHRDAD ANSARI, (3), | § | 18 U.S.C. § 371, Conspiracy to Defraud |
| | § | the United States - Count 4; |
| Defendants. | § | 18 U.S.C. §§ 1001(a)(3) and 2, Making |
| | § | Use of False Writing and Aiding & |
| | § | Abetting - Counts 6 and 7;.and |
| | § | Notice of Government's Demand for |
| | § | Forfeiture.] |

## THE GRAND JURY CHARGES THAT:

### COUNT ONE
### [50 U.S.C. § 1705 and 31 C.F.R. § 560]

#### Introduction

#### The Iran Trade Embargo and the Iranian Transaction Regulations

1.      The International Emergency Economic Powers Act (hereinafter IEEPA), Title 50

United States Code §§1701-1706, authorizes the President to impose economic sanctions on a

foreign country in response to an unusual or extraordinary threat to the national security, foreign

policy or the economy of the United States when the President declares a national emergency

with respect to that threat. Specifically, Title 50 United States Code, § 1705(a) states it shall be unlawful for a person to violate, conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under IEEPA.

2.      On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy or the economy of the United States" and declaring "a national emergency to deal with that threat."

3.      Executive Orders No. 12959 (signed May 6, 1995) and 13059 (signed August 19, 1997), collectively with Executive Order No. 12957, and hereinafter referred to as "Executive Orders," impose economic sanctions, including a trade embargo, on Iran and the Government of Iran. The Executive Orders prohibit, among other things, the exportation, re-exportation, sale or supply, directly or indirectly, to Iran or the Government of Iran, of any goods, technology or services from the United States or by a United States person. The Executive Orders also prohibit any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

4.      The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgations of rules and regulations, as may be deemed necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iran Transaction Regulations, Title 31, Code of Federal Regulations, Part 560 *et seq.*, implementing the sanctions imposed by the Executive Orders.

5.      Title 31, Code of Federal Regulation, 560.204 prohibits, except as otherwise

authorized, the exportation, re-exportation, sale or supply, directly or indirectly, from the United

States or by a United States person, wherever located, of goods, technology or services to Iran or

the Government of Iran, including the exportation, re-exportation, sale or supply of goods,

technology or services to a person in a third country, undertaken with knowledge or reason to

know that such  goods, technology or services are intended specifically for supply, transshipment,

or re-exportation, directly or indirectly, to Iran or the Government of Iran; or such goods,

technology or services are intended specifically for use in the production of, for commingling

with, or for incorporation into goods, technology or services to be directly or indirectly supplied,

transshipped, or re-exported exclusively or predominantly to Iran or the Government of Iran.

6.      The Executive Orders and the Iranian Transactions Regulations (hereinafter ITR)

were in effect at all times relevant to this Indictment.

**Export and Shipping Records**

7.      Pursuant to United States law and regulations, exporters and shippers of freight

forwarders are required to file certain forms and declarations concerning export of goods and

technology from the United States.  Typically, those filings are filed electronically through the

Automated Export System ("AES"), administered by the United States Department of Homeland

Security (DHS), Customs and Border Protection.  A Shipper's Export Declaration ("SED") is an

official document submitted to DHS in connection with export shipments from the United States.

8.      A material part of the SED and AES, as well as other export filings, is information

concerning the end-user or ultimate destination of the export.  The identity of the end-user may

determine whether the goods may be exported (a) without any specific authorization from the

3

United States government; (b) with the specific authorizations or licenses from the United States

Department of Commerce, the United States Department of State, or the United States

Department of Treasury; or (c) whether the goods may not be exported from the United States.

9.      The SED or AES is equivalent to a statement to the United States government that

the transaction occurred as described.  The SED or AES is used, among other purposes, by the

United States Bureau of Census to collect trade statistics and by the Bureau of Industry and

Security, Department of Commerce for export control purposes.  Other United States government

agencies also rely upon the information provided by SED and AES records.

10.     The defendants obtained or attempted to obtain from companies worldwide

105,992 parts valued at approximately $2,630,797.53 involving 1,261 transactions.  The

defendants conducted 599 transactions with 63 different United States companies where they

obtained or attempted to obtain parts from United States companies without notifying the United

States companies these parts were being shipped to Iran or getting a SED or AES to ship these

parts to Iran.  These parts had dual-use military and civilian capability and could be used in such

systems as:  nuclear weapons, missile guidance and development, secure tactical radio

communications, offensive electronic warfare, military electronic countermeasures (radio

jamming), and radar warning and surveillance systems; these parts the defendants obtained or

attempted to obtain included, but are not limited to:

a.      Extra high performance microwave pyramidal absorbers, ultra broadband
microwave absorbers, multi-line low pass filter networks for conducted emissions
measurement, and test cells for performing radiated emissions and radiated immunity test
from a company located in Cedar Park, Texas, within the Western District of Texas.

b.      A solid state broadband high power amplifier rated at 20-500 MHz operating frequency and 500 Watts output power amplifier is suitable for RF, VHF and UHF high power linear applications from a company located in Inglewood, California.

c.      Parts suitable for building a vibration test system that can be used to qualify parts to Mil-Spec standards and to validate their operation in harsh operating environments as found in space flight, military applications and industrial environments:

1. VP4-004 Digital Vibration Control & Analysis System (4 input/2 output ch.), from a company in Verona, New Jersey.
2. Accelerometer Model 352C03, from a company located in Depew, New York.

d.      A RF network design and spectrum management software product that specializes in both pre-deployment and real-time simulation and analysis of military tactical communications from a McClean, Virginia, company.

e.      Underwater Location Beacon with Power Loss Activation used for retrieval of objects located underwater from a Irvine, California, company.

f.      High Performance Portable Spectrum Analyzers: 8565E (9 KHz to 50 GHz), 8564EC (9 KHz to 40 GHz) and 8563E (30Hz to 26.5 Ghz) from a company in Santa Clara, California.

g.      A Ruggedized Laptop with United States gobi mobile broadband technology with global cellular connectivity through high-speed 3G mobile internet networks and is suitable for use in harsh environments from a company in Secaucus, New Jersey.

h.      An OS-9 real-time operating system for embedded system applications located in Hillsboro, Oregon.

i.      Test cells for measuring the electromagnetic radiation from integrated circuits via a connected spectrum analyzer (e.g. GTEM 250: dc to 18 Ghz) from an Edison, New Jersey company.

j.      Ultra-low phase noise precision crystal oscillators used in many military and aerospace applications including wireless communications, GPS, STACOM, and instrumentation applications from a company in Mechanicsburg, Pennsylvania.

k.      A receiver module with an embedded ARM 966E-S processor used for tracking and maintaining positional fixes in extremely weak signal areas from an Aurora, Illinois company.

l.      A pin diode limiter in a hermetic module, which is a protective device that limits the input power to other sensitive devices which are damaged associated with electronic warfare and electronic countermeasures applications for the United States military from a company in Santa Clara, California.

m.      A non-reflective switch, operable in the DC-20GHz region suitable for basestate infrastructure, telecommunication, microwave radios, radar, electronic counter measures and test instrumentation from a company located in Chelmsford, Massachusetts.

n.      Modules suitable for the development of a Software Defined Radio communication system capable of transmitting and receiving voice, video, hi-speed digital data, wireless internet, and satellite signals including TV from a company in Gaithersburg, Maryland.

o.      Software Defined Radio development platform used for commercial telecommunications, military and aerospace SDR communications employing tactical handheld and mobile radios, and educational training from a company located in Richardson, Texas.

p.      Precision amplifiers used for satellite and ground-based communications, missile guidance, military electronic countermeasures, land, sea and airborne radar warning, air traffic control radar, radio astronomy and research and development efforts from a company in Long Island, New York.

q.      Dielectric Resonator Oscillators (DROs) used in commercial, military and space satellite applications from a company located in Camarillo, California.

11.     At all times relevant to the indictment, **Defendant SUSAN YIP a/k/a SUSAN YEH** (hereinafter **YIP**) acted as a broker and conduit for **Defendant MEHRDAD FOOMANIE a/k/a FRANK FOOMANIE** (hereinafter **FOOMANIE**), to buy items in the United States and have them unlawfully shipped to Iran, primarily using her companies:  HIVOCAL TECHNOLOGY COMPANY, LTD., 10F, No. 736, Jhongjheng Road, Jhonghe City, Taipei County 235, Taiwan, and INFINITY WISE TECHNOLOGY, RM1213, Chui King House, Choi Hung Estate, Kowloon, Hong Kong, and ENRICH EVER TECHNOLOGIES CO., LTD, 9F, NO 38, Ming-Fu 13th Street, Taoyuan 330, Taiwan, and WELL SMART (HK) TECHNOLOGY, Room 604, Kalok Building, 720 Nathan Road, Kowloon, Hong Kong, and PINKY TRADING

CO., LTD, 338 Queen's Road Central, Hong Kong, and WISE SMART (HK) ELECTRONICS

LIMITED, Room 1213, Chui King House, Choi Hung Estate, Kowloon, Hong Kong, and

KUANG-SU CORPORATION, 8F, No. 431, DA-You Road, Taoyuan, Taiwan, and using her

email addresses.

   12.   At all times relevant to the indictment, **Defendant FOOMANIE,** bought or

attempted to buy items in the United States and have them unlawfully shipped to Iran through his

companies: SAZGAN ERTEBAT CO. LTD, 40-Hoveizeh Street, Sohrevardi Street, Tehran, Iran

15599, and PANDA SEMICONDUCTOR, Room 2, Unit A 14/F Shun on Commercial Building,

112-114 Des Voeux Road Central, Hong Kong, and  FOANG TECH INC, (OFOGH

ELECTRONICS CO.), 52F, Shun Hing Square, unit 1-8, Di Wang Commercial Center, Shenzhen,

China, and  FOANG TECH INC, (OFOGH ELECTRONICS CO.), Flat/RM 1701—Ricky CTR,

36 Chowg Yip Street, Kwun Tong, Hong Kong, and NINEHEAD BIRD SEMICONDUCTOR,

Rm 15C JuFu Ge, CaiFu Build, Cai Tian Road, Futian Qu, Shen Zhen, Guangdong, 518033,

China, and MORVARID SHARGH CO. LTD., Sohrivardi Shomali St., Andesheh 2 St, After

Daryoush Cross, No. 35, Floor 5, No. 8, Tehran, Iran,, and using his email addresses.

   13.   At all times relevant to the indictment, **Defendant MEHRDAD ANSARI**

(hereinafter **ANSARI**), attempted to transship and transshipped cargo obtained from the United

States by **Defendant YIP** to **Defendant FOOMANIE,** in Iran using **ANSARI's** company GULF

GATE SEA CARGO L.L.C., located in Dubai, United Arab Emirates (hereinafter U.A.E.),  and

using his email address.

   14.   At no time did **Defendant YIP, Defendant FOOMANIE, or Defendant**

**ANSARI,** individually or through any of their companies, ever apply for or acquire a United

States Department of the Treasury's Office of Foreign Assets Control (OFAC) license to export

any item listed in this Indictment to the Republic of Iran.

## THE CONSPIRACY

Beginning on or about October 9, 2007, the exact date unknown, and continuing through the

time of this Indictment, within the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**MEHRDAD FOOMANIE a/k/a FRANK FOOMANIE,**
**and,**
**MEHRDAD ANSARI,**

and others known and unknown to the Grand Jury, knowingly combined, conspired, confederated,

and agreed with each other to commit an offense against the United States, to wit, to wilfully

violate IEEPA and the ITR by exporting and attempting to export United States-origin

commodities to Iran without having first obtained the required authorizations from United States

Department of the Treasury's Office of Foreign Assets Control (OFAC) contrary to Title 50,

United States Code. Section 1705 and Title 31, C.F.R., Section 560 and all in violation of Title

18, United States Code, Section 371.

## OBJECTS OF THE CONSPIRACY

The objects of the conspiracy were:

    a.    to export and provide the items listed in Paragraph 10 of this Indictment, above, to the country of Iran;

    b.    to provide material support for the military and industrial manufacturing base and infrastructure of the country of Iran;

    c.    to evade the prohibitions and licensing requirements of IEEPA and the ITR;

d.    to conceal the prohibited activities and transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity; and,

e.    to profit and enrich themselves through these illegal activities.

## MANNER AND MEANS OF THE CONSPIRACY

The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a.    The Defendants created a scheme and artifice to have **Defendant YIP** purchase and attempt to purchase goods and items from United States' companies in order to transship the parts to Iran to **Defendant FOOMANIE** or to tranship the parts through **Defendant ANSARI** and then to **Defendant FOOMANIE.**

b.    **Defendant FOOMANIE** would instruct **Defendant YIP** which parts he wanted her (through her respective company) to purchase from the United States and ship to him in Iran.

c.    The Defendants used **Defendant YIP's** email addresses and companies to serve as the conduit to purchase the United States goods and items because of her locations in Taiwan and Hong Kong where **Defendant YIP** was located since there was no prohibition to send these goods and items to these places if the true ultimate end-user was actually in Taiwan or Hong Kong.

d.    The Defendants would communicate with each other via email about their scheme and plans and the progress of the purchases and shipments to Iran.

9

e.     After purchasing the goods and items from the United States on behalf of **Defendant FOOMANIE, Defendant YIP** would then ship the goods and items to **Defendant FOOMANIE** or tranship the goods through **Defendant ANSARI** and who would then forward them to **Defendant FOOMANIE.**

f.     From Iran, **Defendant FOOMANIE** would cause bank wire transfers to issue to pay **Defendant YIP** and **Defendant ANSARI** for their respective expenses and profits for purchasing these goods and items from the United States and shipping them to Defendant **MEHRDAD FOOMANIE** in Iran.

g.     Using the funds sent by **Defendant FOOMANIE** from Iran, **Defendant YIP** either individually or through her respective company, would pay the United States companies supplying the goods.

## OVERT ACTS

In furtherance of this conspiracy, **Defendant YIP, Defendant FOOMANIE, and Defendant ANSARI** committed overt acts, including but not limited to the following:

1.     On or about October 24, 2007, **Defendant FOOMANIE** requested **Defendant YIP** contact a company in Cedar Park, Texas, to purchase microwave absorbers for shipment to Iran.

2.     On or about October 24, 2007, **Defendant YIP** informed **Defendant FOOMANIE** that the company in Cedar Park, Texas, microwave absorbers met military specifications.

3.     On or about November 1, 2007, **Defendant FOOMANIE** instructed **Defendant YIP** to contact the company in Cedar Park, Texas, to purchase microwave absorbers for shipment to Iran.

10

4.      On or about November 1, 2007, **Defendant YIP** informed **Defendant FOOMANIE** that there will be an extra document fee for the company in Cedar Park, Texas, microwave absorbers order because the company cannot be told that the sale is to Iran.

5.      On or about November 1, 2007,  **Defendant YIP** answered **Defendant FOOMANIE's** query about how the microwave absorbers can be shipped directly to **Defendant FOOMANIE** in Iran if **Defendant FOOMANIE's** freight forwarder is "powerful" enough and if **Defendant FOOMANIE** paid the aforementioned extra document fee to falsely show United States Customs that the shipment was going to Taiwan rather than Iran.

6.      On or about December 17, 2007, **Defendant YIP** informed **Defendant ANSARI,** who had agreed to assist **Defendants YIP and FOOMANIE** to get the microwave absorbers to Iran, not to contact the company and under no circumstances to tell the company that the shipment was going to Iran because "any mistake will make us in trouble."

7.      On or about December 17, 2007, **Defendant YIP,** when asked for an explanation why the vendor cannot know the actual destination, told **Defendant ANSARI,** "Basically, concerning with USA could not sell anything to IRAN, I told a lie to USA vendor that I sell these absor[b]ers to Taiwan.  So I hope you can be clever and don't say anything about our destination."

8.      On or about December 17, 2007, **Defendant FOOMANIE** instructs **Defendant YIP** to contact the company in Cedar Park, Texas, and advise the company that **Defendant ANSARI** will be the end user and to ship the microwave absorbers to the U.A.E.

9.      On or about February 20, 2008, **Defendant YIP** emailed **Defendant FOOMANIE** telling **Defendant FOOMANIE** that he must tell **Defendant ANSARI** to "shut up" about the

11

actual destination of the microwave absorbers because of the United States export license requirements even to the U.A.E.

10.    On or about February 20, 2008, **Defendant YIP** emailed **Defendant MERHDAD ANSARI** telling him to "shut up" about the actual destination of the microwave absorbers because of the United States export license requirements to the Middle East, which is why she lied to the company in Cedar Park, Texas, and told them the sale would be in Taiwan.

11.    On or about March 24, 2008, **Defendant ANSARI** instructed **Defendant YIP** that the Commerce Department's Office of Export Enforcement would not release the microwave absorbers and that **Defendant YIP** needed to contact the Commerce Special Agent to tell him that **Defendant YIP** wanted to import the cargo to Taiwan.

12.    On or about March 25, 2008, **Defendant SUSAN YIP** emailed **Defendant MEHRDAD FOOMANIE** telling **Defendant FOOMANIE** that she would have "to tell more lies to USA" regarding the microwave absorbers shipment.

13.    On or about March 25, 2008, **Defendant YIP** falsely told a U.S. Department of Commerce Special Agent that the ultimate end-user was HIVOCAL TECHNOLOGY COMPANY in Taipei, Taiwan, to be used for a telecommunication lab.

14.    On or about March 27, 2008, **Defendant MERHDAD ANSARI** instructed **Defendant YIP** to lie to the Commerce Department Special Agent and say that the microwave absorbers will be used in Taiwan, and then to store the microwave absorbers for a while in Taiwan, and then later ship them to Bandar Abbas, Iran.

15.    On or about March 27, 2008, **Defendant YIP** emailed **Defendant FOOMANIE**, and discussed the "bad situation between USA and" Iran and asking if the parts **Defendant**

**FOOMANIE** was ordering was for military or nuclear use and the risks of that the HIVOCAL

company could be "blacklisted," precluding it from future export from the United States, if the

true destination of the microwave absorbers were discovered by the United States

16.    On or about March 27, 2008, **Defendant YIP** falsely told a U.S. Department of

Commerce Special Agent that the ultimate end-user was HIVOCAL TECHNOLOGY

COMPANY in Taiwan and that she understood United States export policies "and always respect

them."

17.    On or about March 29, 2008, **Defendant YIP** emailed **Defendant FOOMANIE**,

and told **Defendant FOOMANIE** "What you ordered from me are mostly dangerous parts, I

always purchase them for you and never got in trouble!!..But you have to set up a company in TW

[Taiwan] to order to some critical parts are easiler [sic] to purchase here, like Miteq.  Upon this

situation you realize that USA could not allow their products send to Middle East, we must be

careful to deal with them and not leave any record in future."

18.    On or about July 25, 2008, during an end-user inspection at HIVOCAL

TECHNOLOGY COMPANY in Taipei, Taiwan, **Defendant YIP** falsely told a U.S. Department

of Commerce Export Control Officer and a U.S. Immigration and Custom Enforcement Officer

that she did not have a buyer for the microwave absorber shipment from Cedar Park, Texas,

shipment knowing that these microwave absorbers would be forwarded to **Defendant**

**FOOMANIE** in Iran.

19.    On or about January 2, 2008, **Defendant FOOMANIE** requested **Defendant YIP**

locate a supplier of solid state broadband high power radio frequency amplifier for shipment to

Iran.

13

20.     On or about January 2, 2008, **Defendant YIP** falsely told a company in Ingelside, California,. that the end-user for the solid state broadband high power radio frequency amplifiers she was purchasing was Chunghwa Telecom located in Taiwan when in fact she knew she was purchasing the items for **Defendant FOOMANIE** for shipment to Iran.

21.     On or about July 9, 2008, **Defendant YIP** forwarded to **Defendant FOOMANIE** her inquiry to the company in Ingelside, California, whether a competitor of the Defendants had attempted to buy the same parts from this company and that this competitor might attempt to purchase the same parts by "trying to get your product through different methods" because the competitors might be selling these parts to "a dangerous country."

22.     On or about August 7, 2008, **Defendant YIP** requested that the freight forwarder bribe the United Arab Emirates Customs in order to expedite the Ingelside, California, company shipment to **Defendant FOOMANIE** in Iran.

All in violation of Title 50, United States Code, Section 1705(b), Title 22, United States Code, Section 8512(c), and Title 31 Code of Federal Regulations, Section 560.

## COUNT TWO
### [18 U.S.C. §§ 371 and 1343]

The Introduction, the Manner and Means, and the Overt Acts to Count One of this Indictment are hereby incorporated by reference as if fully set forth.

Beginning on or about October 9, 2007, the exact date unknown, and continuing through the time of this Indictment, within the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**MEHRDAD FOOMANIE a/k/a FRANK FOOMANIE,**
**and,**
**MEHRDAD ANSARI,**

14

knowingly, willfully, and unlawfully, combined, conspired, confederated, and agreed with each other

and others known and unknown to the Grand Jury to commit offenses against the United States, that

is, the **DEFENDANTS** knowingly devised a scheme to purchase and obtain various parts from the

United States' companies in order to ship these parts to Iran by means of materially false and

fraudulent pretenses, representations and promises, and transmitted and caused to be transmitted by

means of wire communication in interstate and foreign commerce, any writings, that is that the

**DEFENDANTS** used materially false and fraudulent emails to purchase United States goods from

these companies while hiding that the ultimate destination for these goods was Iran and used emails

between the defendants to communicate and to further their unlawful scheme.

All in violation of Title 18, United States Code, Sections 371 and 1343.

## COUNT THREE
### [18 U.S.C. §§ 1956(h) and 1956(a)(2)(A)]

The Introduction, the Manner and Means, and the Overt Acts to Count One of this Indictment

are hereby incorporated by reference as if fully set forth.

Beginning on or about October 9, 2007, the exact date unknown, and continuing through the

time of this Indictment, within the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**MEHRDAD FOOMANIE a/k/a FRANK FOOMANIE,**
**and,**
**MEHRDAD ANSARI,**

knowingly, willfully, and unlawfully, combined, conspired, confederated, and agreed with each

other and others known and unknown to the Grand Jury to commit offenses against the United

States, that is, the **DEFENDANTS** conspired to transport, transmit, and transfer a monetary

instrument to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit:  wire fraud.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOUR
### [18 U.S.C. § 371]

The Introduction, the Manner and Means, and the Overt Acts to Count One of this Indictment are hereby incorporated by reference as if fully set forth.

Beginning on or about October 9, 2007, the exact date unknown, and continuing through the time of this Indictment, within the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**MEHRDAD FOOMANIE a/k/a FRANK FOOMANIE,**
**and,**
**MEHRDAD ANSARI,**

knowingly, willfully, and unlawfully, combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury to commit offenses against the United States, that is, to defraud the Department of the Treasury and the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from the United States to Iran without authorization or a license, by deceit, craft, trickery, and dishonest means.

All in violation of Title 18, United States Code, Section 371.

## COUNT FIVE
### [18 U.S.C. §§ 1956(h) and 1956(a)(2)(A)]

The Introduction, the Manner and Means, and the Overt Acts to Count One of this Indictment are hereby incorporated by reference as if fully set forth.

16

Beginning on or about October 9, 2007, the exact date unknown, and continuing through the time of this Indictment, within the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**MEHRDAD FOOMANIE a/k/a FRANK FOOMANIE,**
**and,**
**MEHRDAD ANSARI,**

knowingly, willfully, and unlawfully, combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury to commit offenses against the United States, that is, the **DEFENDANTS** conspired to transport, transmit, and transfer a monetary instrument to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit:  willfully exporting goods from the United States to Iran without a license in violation of Title 50, United States Code, Sections 1702 and 1705 and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT SIX
### [18 U.S.C. §§ 1001(a)(3) and 2]

The Introduction, the Manner and Means, and Overt Acts 11 and 13 to Count One of this Indictment are hereby incorporated by reference as if fully set forth.

On or about the March 25, 2008, in the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**and,**
**MEHRDAD ANSARI,**

aided and abetted by each other, in a matter within the jurisdiction of United States Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement, hereinafter referred to

as BIS, did knowingly and willfully make and use a material false writing and document by presenting to an agent of BIS an email claiming that the ultimate end-user was HIVOCAL TECHNOLOGY COMPANY in Taipei, Taiwan, to be used for a telecommunication lab knowing the same to be false, that is the Defendants knew the ultimate end-user was in Iran.

In violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

## COUNT SEVEN
### [18 U.S.C. §§ 1001(a)(3) and 2]

The Introduction, the Manner and Means, and the Overt Acts 14 and 16 to Count One of this Indictment are hereby incorporated by reference as if fully set forth.

On or about the March 27, 2008, in the Western District of Texas and elsewhere, the Defendants,

**SUSAN YIP a/k/a SUSAN YEH,**
**and,**
**MEHRDAD ANSARI,**

aided and abetted by each other, in a matter within the jurisdiction of United States Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement, hereinafter referred to as BIS, did knowingly and willfully make and use a material false writing and document by presenting to an agent of BIS an email claiming that the ultimate end-user was HIVOCAL TECHNOLOGY COMPANY in Taiwan and that she understood United States export policies "and always respect them" knowing the same to be false, that is the Defendants knew the ultimate end-user was in Iran.

In violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

### NOTICE OF GOVERNMENTS'S DEMAND FOR FORFEITURE
[*See* Fed. R. Crim. P. 32.2(a)]

#### I.

### Conspiracy to Violate the International Emergency Economic Powers Act and the Iranian Transaction Regulations Violations and Forfeiture Statutes
[Title 18 U.S.C. § 371 and Title 50 U.S.C. § 1705; subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461]

As a result of the foregoing criminal violations set forth in Count One which are punishable by imprisonment for more than one year, **DEFENDANTS SUSAN YIP a/k/a SUSAN YEH (1), MEHRDAN FOOMANIE a/k/a FRANK FOOMANIE (2), and MEHRDAD ANSARI (3)** shall forfeit all right, title, and interest to the United States pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

**Title 18 U.S.C. § 981(a)(1)(C)**
> **(a)(1)** The following property is subject to forfeiture to the United States:
> **(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . .of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

#### II.

### Conspiracy to Commit Wire Fraud Violations and Forfeiture Statutes
[Title 18 U.S.C. §§ 371 and 1343; subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461]

As a result of the foregoing criminal violations set forth in Count Two which are punishable by imprisonment for more than one year, **DEFENDANTS SUSAN YIP a/k/a SUSAN YEH (1), MEHRDAN FOOMANIE a/k/a FRANK FOOMANIE (2), and MEHRDAD ANSARI (3)** shall forfeit all right, title and interest to the United States pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

Title 18 U.S.C. § 981(a)(1)(C)

(a)(1)   The following property is subject to forfeiture to the United States:

(C)   Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . .of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

### III.
### Conspiracy to Commit Money Laundering Violations and Forfeiture Statutes
[Title 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A); subject
to forfeiture pursuant to Title 18 U.S.C. § 982(a)(1)]

As a result of the foregoing criminal violations set forth in Counts Three and Five which are punishable by imprisonment for more than one year, **DEFENDANTS SUSAN YIP a/k/a SUSAN YEH (1), MEHRDAN FOOMANIE a/k/a FRANK FOOMANIE (2), and MEHRDAD ANSARI (3)** shall forfeit all right, title and interest to the United States pursuant to Title 18 U.S.C. § 982(a)(1), which states:

Title 18 U.S.C. § 982(a)(1)

(a)(1)   The court, in imposing sentence on a person convicted of an offense in violation of section 1956. . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or traceable to such property.

It is the intent of the United States of America to seek the forfeiture of any property belonging to **DEFENDANTS SUSAN YIP a/k/a SUSAN YEH (1), MEHRDAN FOOMANIE a/k/a FRANK FOOMANIE (2), and MEHRDAD ANSARI (3)**, which represents property involved in or traceable to, or property derived from proceeds traceable to the violations set out in the above-described counts, pursuant to Fed. R. Crim P. 32.2(c)(1) and Title 18 U.S.C. § 982 (*see* Title 21 U.S.C. § 853(p)).

# IV.
## Substitute Assets

If any of the property described above, as being subject to forfeiture for violations of Title 18 U.S.C. §§ 371, 1343, 1956(h) and 1956(a)(2)(A) and Title 50 U.S.C. § 1705 and subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable by Title 28 U.S.C. § 2461 and Title 18 U.S.C. § 982(a)(1), as a result of any act or omission of **DEFENDANTS SUSAN YIP a/k/a SUSAN YEH (1), MEHRDAN FOOMANIE a/k/a FRANK FOOMANIE (2), and MEHRDAD ANSARI (3):**

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States of America to seek the forfeiture of any other property of **DEFENDANTS SUSAN YIP a/k/a SUSAN YEH (1), MEHRDAN FOOMANIE a/k/a FRANK FOOMANIE (2), and MEHRDAD ANSARI (3),** up to the value of said property as substitute assets

pursuant to Fed. R. Crim. P. 32.2(c)(1) and Title 21 U.S.C. § 853(p).

A TRUE BILL.

_____
FOREPERSON OF THE GRAND JURY

JOHN E. MURPHY
UNITED STATES ATTORNEY

By:  _____
MARK T. ROOMBERG
ASSISTANT UNITED STATES ATTORNEY

22